*In re* ESTATE OF LENORA E. OSBORN, Deceased (Wanda Asplund *et al.*, Plaintiffs-Appellants, v. James Osborn, Indiv. and as Ex'r of the Estate of Lenora E. Osborn, Deceased, *et al.*, Defendants-Appellees).

Third District   No. 3—91—0302

Opinion filed August 31, 1992.—Rehearing denied October 14, 1992.

Law Offices of John H. Bisbee, of Macomb (John H. Bisbee, of counsel), for appellants.

Carl E. Hawkinson, of Barash, Stoerzbach & Henson, of Galesburg (Robert C. Stoerzbach, of counsel), for appellee James Osborn.

Lyman R. Fort, of Fort & Neff, of Stronghurst, for appellee Rosetta Baptist Church.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

Wanda Asplund, Carol Carlson, Gene Osborn, and Paul Osborn, plaintiffs in a suit to contest the will of their deceased mother, Lenora E. Osborn, appeal from summary judgment entered in the circuit court of Warren County in favor of their brother, defendant James (Jim) Osborn. At issue is the validity of a will executed by decedent about six weeks before her death while hospitalized during her final illness.

Pertinent facts taken from the depositions and affidavits which accompanied defendant's motion for summary judgment and plaintiffs' responses are as follows: Plaintiffs are the four oldest children of Hobart and Lenora E. Osborn, all of whom had declined to join Ho-

bart in the family farming operation. Defendant Jim Osborn, the youngest son, did farm in partnership with his father all of his life, and as a result of their joint efforts, Hobart was able to acquire additional farmland with the profits from the farming operation. The farm bank accounts and land were in the name of Hobart Osborn alone until about 1974 when Jim acquired a parcel of farmland, known as the Noonan farm, in his name. Also, in 1978 Jim's name was put on the title to a farm owned by Hobart, known as the Patterson farm.

In 1972, before Jim had acquired title to any farmland, Hobart and Lenora executed their wills. Hobart's will provided that the home farm, known as the Gerlaw farm, was to pass to his wife Lenora and the Patterson farm to Jim. The will acknowledged that Jim had a one-half interest in the farm machinery, livestock, and unsold crops, and it then provided that Hobart's one-half interest in the machinery was to go to Jim while his one-half interest in the livestock and unsold crops was to go to plaintiffs and his wife Lenora, with the remainder of his estate to be divided equally between Lenora, plaintiffs and Jim. Lenora's new will provided that, in the event Hobart died before her, all her real estate would go to plaintiffs. Thus, Hobart and Lenora intended that Jim would have the Patterson farm as soon as Hobart died, while plaintiffs would have to wait until Lenora died to acquire the farm intended for them.

Hobart died in 1982, and Lenora and Jim were named coexecutors of his estate. At the time he died, he and Jim were in the process of acquiring a farm known as the Gridley farm by trading the Noonan farm and the Patterson farm. According to Jim, they intended to use the income from grain sales to pay off all their outstanding debts. Jim also stated that Hobart intended that title to the Gridley farm be in Jim's name alone since the Patterson farm had been traded for it and the Patterson farm was to be Jim's. Because Hobart died before the transaction was completed, plaintiffs claimed that the Gridley farm was a part of the estate and that they were entitled to their respective shares. Plaintiffs also claimed one-half the proceeds of sale of the grain in storage which Jim indicated was to be used to pay Hobart's share of the partnership debts. (It appears that Hobart's will disposed of his share of the grain on hand without providing for satisfaction of any unpaid expenses related to growing, harvesting, and storing that grain, thus placing the burden for those expenses on the remainder of his estate.)

Lenora tried to get the dispute settled and repeatedly asked plaintiffs to withdraw their claims. She instructed the attorney for the estate, David Hultgren, to inform plaintiffs' attorney that she would

change her will and disinherit plaintiffs if they did not settle their claim. Finally Lenora mortgaged the Gerlaw farm in order to pay each of the plaintiffs $25,000. Apparently plaintiffs were making additional demands in 1986 when Lenora was diagnosed as having cancer and was hospitalized on April 17 in Macomb. On April 25 she was transferred to Methodist Hospital in Peoria for radiation treatments. The treatments were not helpful and Lenora's condition worsened rapidly. She continued to lose weight, to suffer a great deal of pain, and to become weaker. As the disease progressed, she became increasingly confused and disoriented.

Lenora executed the will at issue on June 3, 1986. The parties do not dispute the following facts related to that last will executed by her: While a patient in Methodist Hospital, Lenora was concerned that Hobart's estate had not yet been closed and that plaintiffs had not agreed to a settlement. Lenora asked a family friend and neighbor, Keith Sanderson, to help her get a new will drawn. Sanderson, a retired attorney and associate judge, contacted a Peoria law firm on Friday, May 30, and explained to attorney Edwin Walker that Lenora was terminally ill and desirous of executing a new will.

Walker visited Lenora in the hospital on Monday, June 2, to ascertain what provisions she wanted in the will and to satisfy himself that she had testamentary capacity. At Lenora's request, Sanderson contacted the persons Lenora wanted to be witnesses to the will (Mildred and Glenn Lipp of Gerlaw and JoAnn Hart of Monmouth), and Walker met with the witnesses on June 2 at Methodist Hospital and asked what they knew of the family situation and of Lenora's wishes for a new will. The witnesses indicated that Lenora had repeatedly said she would give Jim her farm if plaintiffs would not discontinue their litigation against her and Jim. Walker also explained to the witnesses the requirements of testamentary capacity. Walker further ascertained by questioning that neither Sanderson nor any of the witnesses had any interest in Lenora's estate.

Walker and the witnesses returned on Tuesday, June 3, at which time Walker questioned Lenora as to the date, the names of the witnesses, who her heirs were, and what property she owned. She answered correctly to all the questions, and after reading the will, she said that was what she wanted to do. She then signed the will followed by the signing of the witnesses. This new will provided for a $10,000 bequest to Rosetta Baptist Church and the bequest of her residence to plaintiffs. All the rest of her property she left to her son Jim, whom she named as executor. Walker stated that he never met or had any contact with Jim.

Other facts are in dispute, either by reason of direct contradiction or by inference. Although there is no direct evidence that Sanderson acted as agent for Jim in getting Lenora's new will prepared, plaintiffs argue that such agency may be inferred from the evidence. In his 1990 deposition, Sanderson said that he had talked to Jim about the "family situation" approximately 40 to 60 times since 1982 and that he had mentioned to Jim that Lenora was having trouble getting her will changed. Sanderson insisted that he talked much more with Lenora than he did with Jim. In Jim's deposition, he said that he only saw Sanderson three or four times per year and that he never had an in-depth discussion about the wills of his father and mother, although he admitted the subject might have been "casually mentioned" four or five times. Jim stated that he and Sanderson discussed farming, not legal matters, because Sanderson did not want to get involved.

Sanderson states that he did not tell Jim about the arrangements for the new will because he thought it was better for the beneficiary not to be involved. Jim also stated under oath that he did not know about the new will until after Lenora's death. In one deposition, Jim was asked if he had ever talked to Sanderson about Lenora's new will, and Jim answered, "No, because I don't want to know anything." Jim was then asked, "Why don't you?" He responded, "Why would I want to know anything about that? I want to be totally dumb about it. I don't want to know no names. I'm not going to look who signed that because I don't know these people. I don't even want that name in my head. Why would I want to know anything about that? If my mother did that and she wanted to do it and she asked somebody to help her, fine and dandy."

Plaintiffs filed affidavits by Carol Carlson and Wanda Asplund which were stricken by the trial court but which are an issue on appeal. In her affidavit Carol asserted that she was a daughter of Lenora and Hobart Osborn and resides in Roseville, Illinois; that she and her sister Wanda Asplund visited their mother every other day in the hospital; that they visited their mother on Sunday, June 1, 1986, and intended to visit her again on June 3; that she had discussed her visiting schedule with her brother Jim; that Jim called her during the latter part of the day of June 2 and advised her not to visit on June 3 because the doctors were discontinuing some of Lenora's treatment and it would be better for Lenora if she and Wanda did not come; that by reason of Jim's call, she and Wanda did not visit Lenora on June 3; and that at no time during their visits did Lenora mention her will or estate plans. Wanda stated in her affidavit that she and Carol visited Lenora every other day in Methodist Hospital and also related

certain resentments that Jim had communicated to her concerning the dispute involving Hobart's estate.

In his deposition, Jim denied that he called Carol and advised her not to visit their mother on June 3. Jim also stated that he had no recollection as to whether he visited his mother on June 3 or not and that he does not keep a diary or calendar of appointments. He said that he visited his mother frequently, often early in the morning or late in the evening, especially during the planting season when he was busy with farm work.

According to Sanderson, after Lenora was in Methodist Hospital in Peoria he was informed by Jim that Lenora had made an appointment with the attorney for the estate, David Hultgren, to have a new will prepared. Sanderson stated that he learned from a call to Lenora that Hultgren had not kept his appointment and that he verified that with Jim. During Sanderson's next visit, he decided to take some action himself since he believed Lenora would not live long and because she asked him to help her get her will changed. That was when he contacted attorney Edwin Walker.

In David Hultgren's deposition, he stated that he visited Lenora in the hospital in Peoria once during May but that the visit was purely social and the making of a new will was not discussed. He recalls Lenora telling him to be certain that plaintiffs' attorney knew that she would change her will if Hobart's estate were not settled. He stated that Lenora never gave him directions to prepare a new will and that she did not make an appointment for him to come to the hospital. He indicated that he began to campaign for State representative in April of 1986 and did not practice law on a full-time basis thereafter. He said he did not know Lenora had changed her will until after she died.

Also before the trial court were the nurses' notes from Lenora's hospital charts for June 2 and 3. On June 2, the attending nurse charted the following entries:

grand
"0830—Refused breakfast. /son in room.

grandson
0900—Valium withheld per /pt's request so pt. would be as alert as possible.
\*\*\*

1400—Pt. visiting with lawyer
\*\*\*

1715—Lawyer here, visiting with Pt."

Lenora's medication chart for June 2 indicated that Darvocet-N was refused by her grandson and that Valium was withheld "per son's request." On June 3 the nurse noted at 1000, "Tired and weak today. Lawyer and family here." At 2000, the nurse noted, "Confused off and on. Asks about her son in hall." The nurse who cared for Lenora during the morning of June 2 is deceased. Depositions were taken of the other nurses who attended her, but none of them had any independent recollection of Lenora's family or other visitors for the days of June 2 and 3. Nurse Amy Parks, who cared for Lenora during the 3 to 11 p.m. shift on June 3, testified that Lenora's son "was there a lot" during her illness.

Plaintiffs have provided affidavits from 8 of Lenora's 10 grandsons in which each swears that he did not visit Lenora on June 2 or 3. There was no affidavit from Brian Osborn, Jim's son, but he testified in his deposition that he visited Lenora in Methodist Hospital only on Thursday, May 29, 1986. There was nothing under oath from the remaining grandson, Peter Osborn.

The attending physician in Peoria, Dr. Michael Veeder, stated in his deposition that his progress notes for Lenora disclose that he found her alert on June 1, 2, and 3. On June 4, he noted that she was depressed. On the basis of his notes, Dr. Veeder stated that he would assume that Lenora knew who her children were, what property she owned, and what she wanted to do with it. Dr. Veeder noted a decline in her general condition beginning June 8, 1986.

In granting defendant's motion for summary judgment, the trial court ruled that affidavits of Carol Carlson and Wanda Asplund should be stricken. Those paragraphs relating to the affiants' visits to Lenora were stricken because they set forth events which took place in the presence of the decedent and, therefore, violated the Dead Man's Act (Ill. Rev. Stat. 1987, ch. 110, par. 8—201). Other paragraphs setting forth conversations between the affiants and Jim were stricken because they were not material to the issues of testamentary capacity and undue influence. The court also ruled that there was no question of fact that decedent had testamentary capacity when she signed the June 3 will and that there was no question of fact regarding whether Jim participated in the procurement, preparation, or execution of the June 3 will. Later the trial court denied plaintiffs' motion to reconsider with a ruling that plaintiffs have failed to provide any competent evidence to show that Jim procured the will.

On appeal plaintiffs contend that the trial court erred (1) in granting summary judgment on the testamentary capacity claim; (2) in striking the affidavits of Carol and Wanda for violation of the Dead

Man's Act; and (3) in granting defendant's motion for summary judgment on the undue influence claim.

### TESTAMENTARY CAPACITY

■ Testamentary capacity requires that the testator have sufficient mental ability to know and remember the natural objects of her bounty, to comprehend the kind and character of property held, and to make disposition thereof according to some plan formed in the testator's mind. (*In re Estate of Wrigley* (1982), 104 Ill. App. 3d 1008.) Evidence of physical impairment standing alone is insufficient to establish a lack of testamentary capacity. (*Manning v. Mock* (1983), 119 Ill. App. 3d 788, 457 N.E.2d 447.) The burden is on the party asserting the lack of testamentary capacity to prove it. *In re Estate of Bonjean* (1980), 90 Ill. App. 3d 582.

Here we have clear and credible evidence from the witnesses to the will, the attorney who drew the will, and Judge Sanderson that on June 3, 1986, Lenora knew who her heirs were, understood what property she owned, and had devised a plan of disposition which was consistent with repeated statements made before her illness. This direct testimony is corroborated by her doctor. The nurse's notation that she was weak and tired in the morning of June 3 describes her physical condition, not her mental capacity, and the note of some confusion at 10 p.m. on June 3 did not contradict the testimony of her mental alertness at 10 a.m. the same day. Where, as here, the witnesses clearly establish that testator had the requisite mental capacity to make a will, summary judgment on that issue is proper. (*In re Estate of Kietrys* (1982), 104 Ill. App. 3d 269.) Since there is no genuine issue of material fact concerning Lenora's testamentary capacity when she signed her will on June 3, 1986, we hold that summary judgment was properly entered on that issue.

### DEAD MAN'S ACT VIOLATION

The portions of the affidavits of Carol Carlson and Wanda Asplund that were stricken for violation of the Dead Man's Act were those paragraphs stating that Carol and Wanda made it a practice to visit Lenora at Methodist Hospital every other day, that they had visited her on Sunday, June 1, and intended to visit her on Tuesday, June 3, and that during their visits Lenora never discussed her will.

The trial court also ordered stricken those portions of the affidavits relating Jim's alleged phone call to Carol on June 2 telling her not to visit Lenora on June 3. The court ruled those statements are not relevant or material to the issues of this case involving testamen-

tary capacity and undue influence. Although plaintiffs have not argued on appeal that this portion of the court's ruling was erroneous, they do argue that the affidavits are intended to show that Jim knew of the pattern of their visits and that he acted to prevent them from being at the hospital on the day Lenora was to sign a new will. Plaintiffs then contend that an inference can be drawn that Jim participated in procuring the new will.

The Dead Man's Act (Ill. Rev. Stat. 1987, ch. 110, par. 8—201) provides in part:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased *** [with certain exceptions not here relevant]."

■ The last paragraph of both affidavits purported to state that Lenora never conversed about her will or estate during visits by her daughters at Methodist Hospital. In our view, a statement that a particular subject was never discussed violates the statutory prohibition against testifying to any conversation with the deceased, and the trial court correctly ruled that these statements must be stricken.

The remaining portions of the affidavits at issue here are those concerning events, *i.e.*, the dates of visits to the hospital. The current Dead Man's Act does not impose a general rule of incompetency on adverse parties or interested persons, but rather bars such parties and persons from testifying concerning conversations with decedent and events occurring in decedent's presence. *Manning v. Mock* (1983), 119 Ill. App. 3d 788, 457 N.E.2d 447.

Plaintiffs argue that they offer the evidence of visits to Lenora, not to show the truth of the statement that they made the visits, but to show that they communicated a pattern of visits to Jim and that he dissuaded them from going on June 3. They insist that communication to Jim of the pattern of visits does not constitute an event occurring in Lenora's presence and could not have been refuted by Lenora. Defendant argues that the testimony that they visited Lenora in an every-other-day pattern and that they visited her on June 1 and were due to return on June 3 were all matters which Lenora could have refuted.

In our view, testimony that Jim was told that hospital visits took place according to a certain pattern is not the kind of evidence which the Dead Man's Act was intended to bar. Plaintiffs do not rely upon

any conversations or occurrences happening in the course of those visits. We conclude that the trial court erred in striking the affidavits of Carol Carlson and Wanda Asplund with the exception of the last paragraph of each affidavit (relating what decedent did not discuss), both of which were properly stricken.

## UNDUE INFLUENCE

Plaintiffs contend that the evidence in the affidavits and depositions before the court presented a disputed question of material fact as to whether Jim exercised undue influence upon Lenora sufficient to avoid the June 3 will.

The legal standard in such a case is as follows:

> "Undue influence which will avoid a will must be directly connected with the execution of the will itself, must operate when the will is made, must be directed toward the procuring of the will in favor of a particular person, and be such as to destroy the freedom of the testator's action, thereby making the instrument more the result of the will and intent of another than that of the testator himself. [Citations.] No inference of undue influence arises from decedent's age and physical and mental condition ***. Undue influence cannot be established merely by inference, though circumstances may tend to do so. [Citation.] Nor can undue influence be inferred from the provisions of the will in defendant's favor, inasmuch as a testator may distribute his estate as he pleases ***." *Hockersmith v. Cox* (1950), 407 Ill. 321, 325-26, 95 N.E.2d 464, 467.

Accord *In re Estate of Lemke* (1990), 203 Ill. App. 3d 999.

Plaintiffs admit that there is nothing in the record to indicate that Jim directly participated in the preparation of Lenora's will or that he personally procured its preparation. Sanderson was the active participant, not Jim. Plaintiffs insist, however, there is an issue of fact as to whether an inference could be drawn that Sanderson acted as the agent of Jim in arranging the preparation of the new will. In *Herbolsheimer v. Herbolsheimer* (1977), 46 Ill. App. 3d 563, 566, 361 N.E.2d 134, 137, this court noted that presence of the beneficiary at the execution of the will is not necessary to establish undue influence if secret influences were used against the testator by the one procuring the will. Plaintiffs argue that it is possible to infer that Jim's influence here was carefully concealed but was nonetheless exercised by and through Sanderson.

Plaintiffs rely upon certain contradictions in the evidence to support their theory that Sanderson was acting as agent in behalf of Jim

when he contacted attorney Walker and arranged for witnesses for the execution of the will. Plaintiffs point to the following: (1) affidavits of Carol Carlson and Wanda Asplund indicating that Jim asked his sisters not to visit Lenora on their regular visiting day of June 3, contradicted by Jim's deposition stating that he did not make such a request; (2) Sanderson's testimony that he discussed Lenora's will with Jim, contradicted by Jim's statement that he never discussed her will with Sanderson; (3) Sanderson's testimony that he talked to Jim about his "family situation" 40 to 60 times between 1982 and 1990, contrary to Jim's testimony that he only saw Sanderson three or four times per year and rarely discussed his family matters; and (4) Sanderson's testimony that Jim told him Lenora had made an appointment with attorney Hultgren while she was hospitalized in Peoria for the purpose of preparing a new will, contradicted by Hultgren's statement that Lenora never asked him to prepare a new will.

■ If these contradictory statements were submitted to a trier of fact, if every contradiction were found in favor of plaintiffs, and if every reasonable inference were drawn in favor of plaintiffs, there would be no evidence to support plaintiffs' theory that Sanderson acted as Jim's agent. The affidavits and depositions in the record on appeal can be construed to disclose a question of fact as to whether Jim *knew* that Sanderson was arranging for Lenora to have a new will prepared, but that does not give rise to an inference that Sanderson was acting on behalf of Jim rather than Lenora. Most significant here is the absence of any evidence contradicting Sanderson's statements that Lenora asked him to help her get a new will drawn.

The procedures followed by attorney Walker were carefully intended to verify that Lenora was exercising her own free will, that she was fully competent to execute a will, and that the proposed disposition of her property was rational. It would be hard to find fault with the way Walker proceeded, given the circumstances of this case. Lenora had two opportunities to disclose any doubts she might have had—once on June 2 when Walker met with her alone to discuss what she wanted in her will and again on June 3 when he gave her the will and made certain that was what she wanted to do in front of three friends who had been selected by her to be witnesses. Sanderson was not present either time.

The most that plaintiffs can show is that Sanderson discussed with Jim the family dispute involving the disposition of Hobart and Lenora's property and also the provisions of Lenora's 1972 will. Since there is considerable evidence that Lenora considered Sanderson a trusted friend and that she discussed the family dispute with many of

her friends, some such discussions between Sanderson and Jim would be reasonable under the circumstances. However, no one has testified to any conversation or event which would give rise to an inference that Sanderson acted pursuant to authority from Jim, not Lenora, in arranging for her 1986 will. Instead, the evidence is uncontradicted that Lenora's new will was prepared at her request, according to her directions, and in conformity with her stated desire to see that Jim was treated fairly.

Plaintiffs rely on a will contest case where there was no evidence that the beneficiaries of the will. had personally procured the will and where we held that evidence of direct and indirect participation in the estate plans of the testatrix was sufficient to permit an inference that the beneficiaries were instrumental in procuring the will. There we ruled that the case should be tried to resolve the conflicts in the evidence and to draw necessary inferences. (*In re Estate of Dossett* (1987), 159 Ill. App. 3d 479, 512 N.E.2d 807.) That case can be readily distinguished from the case before us here.

In *Dossett*, the beneficiary of the contested will had a power of attorney and took care of decedent's business, thus having a fiduciary relationship to decedent. Here, there was no evidence that Jim was Lenora's fiduciary or that he dominated her in any way. Lenora managed her own business matters right to the end, even to the point of signing the check to pay attorney Walker for his services in preparing her will. In *Dossett*, the plaintiff was decedent's sister and the beneficiaries under the will were not related to the decedent. Here, the beneficiary is the son of decedent who would not have benefitted under her 1972 will. Also, Lenora believed that Jim had not received what he was entitled to under Hobart's will and that plaintiffs had obtained more than Hobart had intended them to have.

Finally, in *Dossett* there was no evidence as to what transpired at the time the will was executed or that anyone determined that the will represented the desires of decedent; furthermore, there was some evidence that the decedent had complained earlier that defendants were pressing her to change her will in their favor. Here, we have clear and undisputed evidence that Lenora made her wishes known to Sanderson on May 30, to Walker on June 2, and to Walker and the witnesses on June 3. Numerous persons verified that the June 3 will carried out a plan which Lenora had considered and discussed for a long period of time. Hence, *Dossett* does not apply to the case at bar.

The trial court here found that plaintiffs had failed to produce evidence that Jim Osborn procured Lenora's new will, either directly or indirectly through Sanderson, and we conclude that the record sup-

ports the finding of the court. Even considering the erroneously stricken affidavits, we hold that summary judgment in favor of defendant was properly granted.

Reversed in part; affirmed in part.

McCUSKEY and GORMAN, JJ., concur.