DONETTE WISZOWATY *et al.,* Plaintiffs-Appellants, v. JERROLD BAUM-
GARD *et al.,* Defendants-Appellees.

First District (3rd Division)   No. 1—92—1989

Opinion filed January 26, 1994.

Mitchell C. Ex, of Kessler & Ex, of Chicago, for appellant Donette Wiszo-
waty.

Ben Myers, of Myers & Associates, of Chicago, for appellee Jerrold Baum-
gard.

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiffs Donette Wiszowaty and Celine Stachura appeal the trial court's order granting summary judgment to defendant Jerrold Baumgard, the executor and principal beneficiary, in an action to set aside a will.

On appeal plaintiffs assert that summary judgment was improper because the evidence raised triable questions of fact regarding the decedent's testamentary capacity at the time she signed the will and undue influence exerted upon the decedent by defendant Baumgard. Plaintiffs also contend that defendant Baumgard's affidavit submitted in support of his motion for summary judgment should have been stricken on the grounds that it violated Supreme Court Rule 191 (134 Ill. 2d R. 191).

For all the reasons which follow, we affirm the entry of summary judgment in favor of defendant Baumgard.

On April 3, 1987, 77-year-old Helene Jensen executed a will which was filed for probate following her death at age 79 on January 9, 1989. The 1987 will made three specific monetary bequests to four named defendants, i.e., Nelli Rahow ($2,000), Alla Swiek ($1,500), and Jarislaw and Jane Mytko ($1,000). The will designated defendant Baumgard (hereinafter defendant) as the executor and beneficiary of the remainder of the estate. Plaintiffs, the two daughters and sole surviving heirs of decedent, were not included in the will.

On July 27, 1989, plaintiffs filed a petition to set aside the 1987 will based on the allegations that, at the time the will was executed, decedent lacked the testamentary capacity to make a will and was subject to the undue influence of defendant.

In his response to plaintiffs' interrogatories filed on June 29, 1990, defendant stated that he and other neighbors, including Nelli Rahow, occasionally performed various errands for decedent at her request during the years 1986, 1987 and 1988. Defendant recalled walking decedent's dog, making minor repairs to her house and helping her shop for household items. Defendant declared that he was not associated with decedent in any business or other enterprise and did not have anything to do with the drafting of her will.

On July 30, 1990, defendant was deposed. In his deposition, defendant testified that he first met decedent as a neighbor in September 1986. During their conversations, decedent told defendant about her daughters and her desire to preclude her daughters from any possible inheritance. Decedent asked what would happen to her property if she did not have a will and defendant answered that under State law her heirs would get her estate. In response to decedent's question as to how to avoid her estate from going to her

daughters, defendant told her to write a will. Decedent asked defendant if he knew an attorney who she could trust and who would make a house call. Defendant provided the name and telephone number of an attorney to decedent.

Defendant further testified about the events of April 3, 1987, when the contested will was executed at decedent's house. Decedent telephoned defendant at work in the late morning and informed him that she wanted to go the doctor. When defendant arrived at decedent's house, decedent informed him that she had called an attorney, wanted to make her will and then would proceed to the doctor. Mr. and Mrs. Mytko were apparently contacted by decedent to came to her house to witness her will. At decedent's request, defendant called a third person, Judy Breiner, to be a witness to decedent's will. When the attorney arrived, he spoke to decedent alone while the other assembled persons waited in another room. Defendant called the paramedics, who arrived when the witnesses were signing some papers, presumably the will, and who then transported decedent to the hospital. Defendant arrived at the hospital after decedent was already in the emergency room and provided insurance information to the hospital receptionist. Defendant saw the paramedics at the hospital but did not talk to them. Decedent was admitted to the hospital on April 3 and remained there about 7 to 10 days.

Prior to the preparation of decedent's will, defendant was aware that decedent intended to leave the bulk of her estate to defendant and believed that the only property she had was the house. Defendant and his mother moved into decedent's building from their neighboring residence about July 1988.

On March 22, 1991, defendant filed a motion for summary judgment denying the allegations in plaintiffs' petition and attaching his affidavit. In his affidavit, defendant attested that he met decedent in September 1986 and had many conversations with her during the years 1986 to 1989. According to defendant, decedent knew that she had two daughters, owned the house and other personal property, and was the landlord. Decedent accepted money from various tenants, paid her bills, conducted her own banking, took care of her daily needs and was generally self-sufficient. Defendant further stated in his affidavit that decedent "did not have to be hospitalized or placed in a nursing home, was capable of walking around her house as much as she wanted, and in all other respects was physically capable, given her age and illnesses."

Regarding the events of April 3, 1987, defendant attested that he was with decedent for six hours before she signed the will and observed her sign the will of her own free will. Decedent was ada-

mant about executing her will, read the will before signing it, and asked the attorney questions concerning the will both before and after execution. Defendant further stated that decedent "was by no means incompetent or otherwise unable to sign her last will and testament."

Defendant further attested that for the next two years, decedent referred to the 1987 will on many occasions, remembered the terms of the will and expressed her wish that neither of her two children inherit from her estate. Defendant also stated that on the day of her death, decedent told defendant "that she knew she had a will and that she did not want her two children to share in any part of her estate."

In July 1991, plaintiffs filed a supplemental response to defendant's motion for summary judgment and attached an affidavit prepared by Joseph Guzzardo, one of the two paramedics who handled the emergency call for decedent on April 3, 1987. In his affidavit, Guzzardo attested that upon his arrival at decedent's home, decedent complained of rectal bleeding, "appeared pale and her verbal responses were confused." Guzzardo observed several other persons present with decedent and one person "interfered with [the] treatment of [decedent] by attempting to have [decedent] sign some document before she submitted to treatment." Guzzardo felt at that time "that something unusual was going on" and his partner agreed. Guzzardo told defendant that he could not ride with decedent to the hospital. At the hospital, Guzzardo approached defendant and "said to him [defendant] that I [Guzzardo] did not think he would get away with this." Defendant replied "do you want to bet[?]"

Subsequently Guzzardo's deposition was taken on October 3, 1991, and the following testimony was given:

"Q. Did Mrs. Jensen say anything that would make you question her mental state?

A. No.

* * *

Q. She understood you, she was answering? Follow me?

* * *

A. I — well, I mean, she wasn't mentally ill, if that's what you are trying to say.

* * *

Q. How did she come to mention the two daughters?

A. Well, we asked, you know, if she had any family. And she said that she had two daughters.

* * *

Q. Now, it says here [referring to Guzzardo's affidavit] that she was confused. To quote it, her verbal responses were confused. Do you remember any specific response that was confusing to you?

A. I think she was confused exactly how much she was bleeding *** [and] where this blood was coming from. She seemed confused on that.

\* \* \*

Q. Do you remember her being confused about anything else?

A. Not that I remember."

After a hearing on April 20, 1992, the trial court granted defendant's motion for summary judgment.

On appeal, plaintiffs assert that decedent's mental health at the time the will was executed is a matter of dispute and this dispute constitutes a genuine issue of material fact so as to preclude summary judgment. Plaintiffs base their assertion on the hospitalization of decedent on the same day she signed the will, on the statements contained in the affidavit of paramedic Joseph Guzzardo, who transported decedent to the hospital and believed that defendant was acting improperly, and on the failure of defendant to state in his affidavit that decedent was hospitalized on the day she signed the will. Plaintiffs also argue that defendant knowingly and intentionally omitted from his affidavit the fact that he called the paramedics to attend to decedent and thus was aware that decedent was physically ill on the day the will was signed.

Defendant contends that plaintiffs failed to prove or make a *prima facie* case that decedent lacked the proper legal capacity to make a will. We agree.

In determining the propriety of summary judgment, an appellate court applies the *de novo* standard of review. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 102, 607 N.E.2d 1204; *Demos v. National Bank of Greece* (1991), 209 Ill. App. 3d 655, 659, 567 N.E.2d 1083.

To establish the lack of testamentary capacity, the complainant must show that at the time the will was executed the testatrix lacked sufficient mental ability to know and remember who were the natural objects of her bounty, to comprehend the kind and character of her property and to make disposition of her property according to some plan formed in the testatrix's mind. *In re Estate of Sutera* (1990), 199 Ill. App. 3d 531, 536, 557 N.E.2d 371.

Since the law presumes every person sane until the contrary is proved, the burden rests on the party asserting the lack of testamentary capacity to prove it. (*In re Estate of Ciesiolkiewicz* (1993), 243 Ill. App. 3d 506, 511, 611 N.E.2d 1278; *In re Estate of Osborn* (1992), 234

Ill. App. 3d 651, 658, 599 N.E.2d 1329.) "Evidence of physical impairment standing alone is insufficient to establish a lack of testamentary capacity." *Osborn*, 234 Ill. App. 3d at 658.

The *Osborn* court held that summary judgment in favor of the defendant on the issue of testamentary capacity was proper although the testatrix executed her will while hospitalized with a fatal illness about six weeks before her death. On the day the will was executed, a nurse noted on the medical chart of the testatrix that she appeared "tired and weak today" and later in the evening she seemed "confused off and on." The *Osborn* court found that these notations by the nurse did not establish lack of mental capacity on the part of the testatrix because the "weak and tired" notation described her physical condition, not her mental capacity, and the note about her state of confusion at night did not contradict other testimony of her mental alertness on the morning of the same day.

■ Like the court in *Osborn*, we find nothing in the present record to demonstrate that decedent lacked the requisite mental capacity to execute a will on April 3, 1987. The allegations made by plaintiffs refer only to the physical condition of decedent by noting that decedent was hospitalized on the same day as she executed her will. No evidence demonstrates that decedent's physical condition impaired her mental alertness.

The affidavit of paramedic Guzzardo, on which plaintiffs rely, is insufficient to support a claim attacking the testamentary capacity of decedent on the day she signed her will. Guzzardo attested that decedent complained of rectal bleeding, "appeared pale" and made some verbal responses which were "confused." In his deposition, Guzzardo explained that decedent was confused about her physical condition, *i.e.*, "how much she was bleeding," but was not confused about any other matters. In fact, Guzzardo testified that decedent did not say anything that made him question her mental state and that decedent specifically mentioned her two daughters.

Plaintiffs have failed to present any factual basis that would arguably support a cause of action based on the lack of testamentary capacity.

Next plaintiffs assert that the evidence and reasonable inferences drawn from the evidence create genuine issues of fact regarding defendant's exercise of undue influence over decedent in connection with the execution of the will. We disagree.

Undue influence sufficient to invalidate a will is "any improper *** urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely." (*In re Estate of Hoover* (1993), 155 Ill.

2d 402, 411, 615 N.E.2d 736.) To constitute undue influence, the influence must operate to destroy the testator's free will concerning the disposition of his estate and cause the testator to dispose of his property according to the plan of another person. (*Hoover*, 155 Ill. 2d at 411; *Ciesiolkiewicz*, 243 Ill. App. 3d at 513.) Although the influence may have been exerted at any time, it must be directly connected with the execution of the will and operate at the time the will was made. (*Ciesiolkiewicz*, 243 Ill. App. 3d at 513.) "What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case." *Hoover*, 155 Ill. 2d at 411.

To raise a presumption of undue influence, the party contesting the will under that theory must establish the following elements: (1) a fiduciary relationship existed between the testator and a person who substantially benefits under the will; (2) the substantial beneficiaries were in a position to dominate and control the dependent testator; (3) the testator reposed trust and confidence in such beneficiaries; and (4) the will was prepared or procured and executed in circumstances where such beneficiaries were instrumental or participated. *Ciesiolkiewicz*, 243 Ill. App. 3d at 513.

A fiduciary relationship may exist as a matter of law, such as between attorney and client, guardian and ward, and trustee and beneficiary. (*In re Estate of Maher* (1992), 237 Ill. App. 3d 1013, 1017, 606 N.E.2d 46.) In addition, a fiduciary relationship may arise from a relationship which is moral, social, domestic or personal in its origin. (*Maher*, 237 Ill. App. 3d at 1017.) In the context of undue influence, a fiduciary relationship exists where there is a special confidence reposed in one who, by reason of such confidence, must act in good faith and with due regard to the interests of the person reposing that special confidence. (*Ciesiolkiewicz*, 243 Ill. App. 3d at 513.) Where the fiduciary relationship "does not exist as a matter of law, the proof must be clear, convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion." *Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 100, 234 N.E.2d 91.

■ We find no factual basis to reasonably infer that decedent and defendant were in a fiduciary relationship. Plaintiffs offer nothing more substantial than that defendant was a neighbor and subsequently a tenant of decedent, and that defendant and decedent had a conversation regarding her desire to preclude her daughters from inheriting her property. These meager grounds are not sufficient to demonstrate a fiduciary relationship. Thus we find that the trial court properly entered summary judgment on the count relating to undue influence.

Finally, plaintiffs assert that defendant's affidavit violated

Supreme Court Rule 191 (134 Ill. 2d R. 191) and thus should have been stricken by the trial court. Plaintiffs argue that defendant's affidavit improperly contains (1) many statements which are conclusions, and (2) numerous assertions that lack basic foundational requirements (such as time, date, place and persons present during conversations referred to by defendant), which makes it difficult to determine if the affiant actually witnessed the actions of the decedent or gained his information from hearsay sources. Plaintiffs contend that these alleged improprieties violate Rule 191, make the affidavit defective and warrant the striking of the affidavit.

Defendant contends that a full evidentiary foundation need not be included in an affidavit for every statement made and the inclusion of a few statements which are technically incorrect in an affidavit does not void the entire affidavit but rather the court will disregard the irrelevant or improper parts.

Supreme Court Rule 191 governs the form of affidavits used in connection with summary judgment motions and states in pertinent part that affidavits submitted in support of a motion for summary judgment

> "shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all papers upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." 134 Ill. 2d R. 191(a).

In summary judgment proceedings, the purpose of affidavits is to show whether the issues raised are genuine and whether each party has competent evidence to support his position. (*Harris Bank Hinsdale, N.A. v. Caliendo* (1992), 235 Ill. App. 3d 1013, 1025, 601 N.E.2d 1330.) An affidavit actually substitutes for trial testimony and thus should meet the same requirements as competent testimony. (*Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.* (1991), 210 Ill. App. 3d 231, 236, 569 N.E.2d 55.) Any evidence that would be inadmissible at trial cannot be considered in a summary judgment proceeding. *Harris Bank*, 235 Ill. App. 3d at 1025.

However, minor technical deficiencies contained in an affidavit do not preclude its consideration because substance and not form controls. (*Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 480 N.E.2d 1176; *Mount Prospect State Bank v. Forestry Recycling Sawmill* (1980), 93 Ill. App. 3d 448, 417 N.E.2d 621.) As we have noted, evidentiary rules do apply. (*E.g., Cole Taylor Bank v. Corrigan* (1992), 230 Ill. App. 3d 122, 595 N.E.2d 177.) In *Cole Taylor Bank*, the trial court

erred in relying on an affidavit of a bank vice-president containing a summary of bank records without presentation of underlying records. The affidavit was challenged on the grounds that it violated the best evidence (original writing) rule, the hearsay rule, and the business records rule. The appellate court found that the bank "did not lay the foundation necessary to overcome the original writing and hearsay rules." *Cole Taylor Bank*, 230 Ill. App. 3d at 130.

■ We find that several statements in defendant's affidavit are improper for failure to lay a proper foundation and for being conclusory. However, where improper material appears in an affidavit, only the tainted portion should be excised as opposed to the entire affidavit. *Murphy v. Urso* (1981), 88 Ill. 2d 444, 462, 430 N.E.2d 1079; *Rinchich v. Village of Bridgeview* (1992), 235 Ill. App. 3d 614, 622, 601 N.E.2d 1202.

Moreover, notwithstanding these improprieties, we can consider on appeal only those facts which were properly included in the affidavit. (*Mount Prospect State Bank*, 93 Ill. App. 3d at 459-60 (the appellate court stated that in deciding the appeal, it considered only those facts which were properly asserted on personal knowledge).) Since we review summary judgment orders *de novo*, we consider only the untainted portion of defendant's affidavit.

For all the foregoing reasons, we affirm the entry of summary judgment in favor of defendant.

Affirmed.

TULLY, P.J., and CERDA, J., concur.