745 N.E.2d 608 (2001)
319 Ill. App.3d 661
253 Ill.Dec. 485
In re T.J., K.J. and I.J., Minors, Minor-Respondents-Appellees (The People of The State of Illinois, Petitioner-Appellee
v.
Wanda Cooper, Respondent-Appellant).
No. 1-99-1678.
Appellate Court of Illinois, First District, First Division.
February 20, 2001.
*610 Rita Fry, Public Defender of Cook County, Emily Eisner, Assistant Public Defender, Office of the Public Defender of Cook County, Chicago, for Appellant.
Richard A. Devine, State's Attorney and Renee Goldfarb, Kenneth T. McMurray and Susan R. Schierl Sullivan, Assistant State's Attorneys, Chicago, for Appellee.
Patrick T. Murphy, Charles Golbet, Larraine L. Granger, Office of the Cook County Public Guardian, Chicago, for Minor-Respondents.
Justice COHEN delivered the opinion of the court:
The State petitioned the circuit court to find the respondent an unfit parent, terminate her parental rights and appoint a guardian with the power to consent to adoption of her three minor children.
The State moved for a summary determination as to the respondent's unfitness on the grounds that she was unable to discharge parental responsibilities due to mental illness. The juvenile court judge granted the State's motion and, after a best interests hearing, the judge terminated the respondent's parental rights and appointed a guardian.
The respondent now appeals the summary finding of unfitness.

BACKGROUND
This case concerns three children of Wanda Cooper: I.J., born September 23, 1990; K.J., born November 25, 1989; and T.J., born December 26, 1988. The biological father of I.J., K.J. and T.J. is Ms. Cooper's previous husband, DeAngelo. Ms. Cooper is now married to David Cooper and has lived with him for several years. Mr. Cooper's two daughters also live with the Cooper family.
In 1993, the State filed petitions for adjudication of wardship and motions for temporary custody of I.J., K.J. and T.J. The petitions alleged that I.J. had been physically abused and that K.J. and T.J. were at substantial risk of physical injury. The children were taken into protective custody on March 18, 1993, after I.J. was found with a black eye. After a hearing on April 6, 1993, the Illinois Department of Children and Family Services (DCFS) was awarded temporary custody.
DCFS compiled a client service plan with Ms. Cooper. The plan indicated that Ms. Cooper had been diagnosed with a mental illness that required professional treatment. DCFS referred Ms. Cooper for psychological evaluation and treatment at an outpatient clinic.
On September 22, 1994, the children were found to be abused pursuant to the petitions for adjudication of wardship. On February 28, 1995, Dr. Arthur Price, the psychiatrist to whom Ms. Cooper had been referred, submitted his evaluation to the court. The court entered disposition orders whereby Ms. Cooper lost custody of the children. The court then entered an order that Ms. Cooper submit to a forensic clinical services psychiatric evaluation. The psychiatrist who conducted the evaluation was Dr. James Corcoran.
On February 8, 1996, the juvenile court ordered Ms. Cooper to be referred for an assessment by the parental assessment team at the University of Illinois at Chicago Hospital. On March 20, 1996, the court entered an order changing the permanency goal for the children from long-term foster care to adoption. On August 6, 1997, the parental assessment team filed its report. A week later the State filed a petition for appointment of a guardian with right to consent to adoption. The petition alleged that Ms. Cooper was an unfit parent under, inter alia, section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West *611 1998)). This section of the Adoption Act classifies a parent as unfit if there is a finding of an "[i]nability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of * * * mental illness * * * and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 1998).
On November 5, 1998, the State filed a motion for summary judgment on the issue of whether Ms. Cooper was unfit due to mental illness. Attached to the motion were the parental assessment team report and an update. Attached to Ms. Cooper's response were an affidavit from her husband and the forensic clinical services evaluation by Dr. Corcoran.
The parental assessment team report had three parts: an evaluation of Ms. Cooper by a psychiatrist, a report on both the parents and the children by child psychologists and a report on the home environment by a child development specialist. The questions that DCFS presented to the parenting assessment team were as follows:
"1. [Ms. Cooper] appears to have been compliant with all services. How much has she been able to internalize?
2. Considering [K.J.]'s special needs, how effective would Ms. Cooper be at disciplining and setting limits?
3. Ms. Cooper often avoids interacting with [I.J.]. What kind of a bond do Ms. Cooper and [I.J.] have?
4. How reliable and stable is Ms. Cooper's support system?"
The examination by Dr. Miller took place on June 16, 1997. Ms. Cooper behaved normally during the interview.
"Ms. Cooper was about ten minutes late for her interview. She was well groomed and dressed appropriately for the weather. She made direct eye contact. She understood the purpose of the interview and was cooperative. She was consistently attentive, and was not distracted by considerable construction noise nearby. Her speech was of normal rate and volume. Her motor activity was of normal rate, with no abnormal movements. Her affect was full range and congruent with content. Her mood was mostly euthymic, although she became sad and slightly tearful when discussing the loss of her children. Her thought processes were tangential, but with no frank loose associations, current hallucinations, current suicidal or homicidal ideation."
In the interview, Ms. Cooper admitted to Dr. Miller that she suffered from depression. She told Dr. Miller that she had been diagnosed with schizophrenia, but she said she did not recognize any of the symptoms in herself. She had been treated with an antipsychotic drug and weekly group therapy. Ms. Cooper said the only effect the medication had was to cause her to gain 100 pounds.
She said that DCFS sent her to another psychiatrist who said she suffered from mild depression and prescribed an antidepressant, which Ms. Cooper said did no good. (Records actually showed that the psychiatrist had diagnosed her with schizophrenia and the medication was an antipsychotic.) When therapy began to interfere with her work schedule she stopped attending and stopped taking the medication. She denied having experienced hallucinations, although in fact she had previously reported visual and auditory hallucinations, as well as ideas of reference (e.g., messages on the television directed specifically at her).
*612 Ms. Cooper had a documented hospitalization for a suicide attempt. She explained this by saying that a roommate stole her medical card and used it after the roommate, not Ms. Cooper, attempted suicide. However, Ms. Cooper had told a prior examiner that she had once attempted suicide by stabbing her wrist and overdosing on tranquilizers.
Ms. Cooper had told previous examiners that she had repeatedly been sexually abused by one or more of her uncles as a child and raped as a teenager. However, she described to Dr. Miller a happy childhood with no major traumas. She did not tell Dr. Miller about physical abuse she suffered at the hands of the children's natural father, although she had spoken of this to others.
Dr. Miller reported that Ms. Cooper had a normal full scale IQ. She scored below average on scales designed to measure social convention, morality and understanding of social interactions, but had a superior score in alertness to her physical environment. Dr. Miller explained that "this pattern is characteristic of people who have a high degree of paranoia."
Ms. Cooper told Dr. Miller that I.J. got his black eye when someone at the shelter where they were living threw something at her but missed and hit I.J. She had told others that she did not know how he got the black eye or that someone else had hit him. In each place she lived, she said, someone else had hit her children.
Dr. Miller's opinion was that Ms. Cooper was "highly disturbed." Examiners had had difficulty diagnosing the specific disorder, in part due to Ms. Cooper's lack of candor. Ms. Cooper's misrepresentations did not seem to be the product of delusions, since they were not fixed. They also did not seem to be part of a deliberate plan to regain custody of her children by fooling the examiners, because the misrepresentations were quite transparent and often involved tangential matters. Rather, the conflicting stories seemed to come from "a primitive cognitive style of someone who has herself been subject to a chaotic environment and severely traumatized." Dr. Miller gave a provisional diagnosis of schizophrenia, paranoid type. She noted that, despite what Ms. Cooper had said, the records indicated that there had been improvement with the antipsychotic medications. However, medication could not have a major impact on Ms. Cooper's interpersonal problems, particularly in light of her denial that she was ill.
As her support system, Ms. Cooper gave her husband and four friends (only two of whose names she could remember). She described her husband as supportive and said they now had a home. A background check on Mr. Cooper revealed that in the previous 10 years he had been charged with robbery, battery, domestic battery and criminal damage to property.
Dr. Miller concluded that Ms. Cooper's "tendencies to grossly misrepresent facts, to deny past and current problems, and to externalize blame place her at very high risk of repeating past abusive and neglectful behavior. Her extreme denial of illness, and resultant lack of treatment for her illness, have led to her being vulnerable to ongoing psychotic symptoms, which in turn increase her risk of abuse and neglect. Her symptoms would be likely to worsen with the stress of parenting. If treatment (e.g. medication and psychosocial rehabilitation) were mandated, she would probably show some improvement (less thought disorder, more organized behavior), but the prognosis for her internalizing the need for treatment long term is poor, at least within the time frame she has available for parenting her children."
*613 The second part of the report was a "parenting competency evaluation" based on interviews with Mr. and Ms. Cooper and the children by child psychologists. The examiners concluded that all three children had special needs. T.J. demonstrated symptoms of depression and anxiety. K.J. was described as "highly disturbed," with marked difficulties in regulating his emotions during a brief separation from his mother. His behavior was consistent with an earlier diagnosis of reactive attachment disorder. I.J. showed signs of restlessness and difficulties in concentrating. He appeared guarded and avoidant with respect to Ms. Cooper. All three had delayed receptive language skills. The examiners faulted Ms. Cooper for failing to recognize the special needs of the children and minimizing any problems. This, they predicted, would make it difficult for her to become a better parent.
Mr. Cooper had a more balanced and realistic view of the children than his wife did, although he also tended to minimize difficulties. He did not idealize his own childhood. When interacting with K.J., however, he was not good at setting limits and went along with whatever K.J. did.
The Coopers were given questionnaires on parenting. They gave certain answers demonstrating "worrisome attitudes about childrearing" concerning, inter alia, toilet training and how long a two year old could be left alone.
Ms. Cooper said that she is a nice parent who does not hit her children. When they misbehave, she said, she explains to them what they have done wrong and has them stand in the corner. Mr. Cooper said he does not hit the children and never has. He tries to discipline the children through "voice control" and taking things away from them. Both emphasized their interest in the children's well-being. They described a large support network, which, the evaluators conceded, could be a strength if it was viable.
The third part of the report was a child development specialist evaluation. Kathleen Pesek, the specialist, observed Ms. Cooper's interactions with the children in the home. According to Ms. Pesek, Ms. Cooper's interactions with her children were worrisome and showed that the attachment between her and her children was insecure. Ms. Cooper hardly interacted with I.J. during the visit, and her interactions with the other children were "superficial." Ms. Pesek also was concerned by Ms. Cooper's tendency to externalize blame, minimize difficulties and deny her mental illness.
The follow-up report by the parenting assessment team concluded that little had changed. It noted that Ms. Cooper had not sought psychiatric help. She still denied her mental illness. She did not engage in a parenting skills training suggested by her DCFS worker. Ms. Cooper told other evaluators she had completed a parenting skills class and did not need more training. She knew that the DCFS permanency goal was for termination of her parental rights and placing her children for adoption. She said this was because of social workers who would not tell her what she needed to do to regain custody of her children.
Accompanying the response to the motion for summary judgment were the report from Dr. Corcoran and an affidavit from Mr. Cooper. In his report, Dr. Corcoran noted that Ms. Cooper's affect was blunted and she lacked energy. Her thought processes were mainly linear but somewhat disorganized. She was perplexed that people kept saying she was schizophrenic. She denied any auditory or visual hallucinations. However, she *614 claimed to have a "sixth sense" that enabled her to predict negative events that would happen to people around her. Her thought processes were devoid of homicidal or suicidal ideation or intent.
She told Dr. Corcoran about having been sexually abused by her uncles and raped as a teenager. She related how K.J. had originally been one of a pair of twins but that her ex-husband had stabbed her in the abdomen, killing the other twin. Her ex-husband also tried to strangle her once on an El platform. She denied having abused her children and denied previous psychiatric hospitalization. She said she lived with her husband and his two daughters in a two-bedroom apartment and that her current marriage was great.
Dr. Corcoran reported that Ms. Cooper exhibited "signs and symptoms of a history of major depression with psychotic features, as well as Schizotypal Personality Disorder." He opined that the psychotropic medication she was taking "allows her to better organize her thinking, allows her to calm her internal anxiety and social anxiety around others, and also allows for better overall functioning." Dr. Corcoran's report concluded:
"Given the characterologic traits and symptoms that were mentioned, it appears that [Ms. Cooper] exhibits only a marginal capacity to parent young children. Her emotional detachment from her children, as indicated in previous reports, is to be expected given the nature of her personality disorder and her inability to form close relationships with others. She does not, however, exhibit any tendency to become violent or neglectful with her children which could be elicited on interview. A psychiatric assessment of her current husband is necessary to assess the overall capacity of both parents to parent emotionally handicapped children effectively."
In his affidavit, Mr. Cooper said he had been living with Ms. Cooper for six years and his children had been living with them for nine months. He said that as long as he had known his wife she had behaved appropriately in interactions with his children and other children. He went on to state that during the period he had known her, she had "never demonstrated any symptoms of mental illness, mental impairment or mental retardation," that she had "been able and competent to parent children," that he had never known her to "misinterpret facts, to deny past problems, to deny current problems, to minimize problems, or to externalize blame" and that he had never known her "to fail to recognize or to fail to understand the needs of her children."
The court granted summary judgment based on the preceding evidence. Then a best interests hearing was held, after which the court granted the petition to terminate parental rights and appoint a guardian with power to consent to adoption. This appeal followed.

ANALYSIS
Summary judgment may be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Telenois, Inc. v. Village of Schaumburg, 256 Ill.App.3d 897, 901, 195 Ill.Dec. 117, 628 N.E.2d 581, 584 (1993). Summary judgment should not be granted if reasonable persons could draw divergent inferences from the undisputed facts. Telenois, 256 Ill.App.3d at 901, 195 Ill.Dec. 117, 628 N.E.2d at 584. In making its ruling, the trial court should examine the pleadings, depositions, exhibits and affidavits of record, construing the evidence in the light most favorable to the nonmoving party. Wogelius v. Dallas, 152 Ill.App.3d 614, 619, 105 Ill.Dec. 506, 504 N.E.2d 791, 794 (1987). Summary judgment is a drastic *615 means of disposing of litigation and should be used only if the right of the movant to relief is clear and free of doubt. Bier v. Leanna Lakeside Property Ass'n, 305 Ill. App.3d 45, 50, 238 Ill.Dec. 386, 711 N.E.2d 773, 777-78 (1999). Our review of a summary judgment order is de novo. Soderlund Brothers, Inc. v. Carrier Corp., 278 Ill.App.3d 606, 614, 215 Ill.Dec. 251, 663 N.E.2d 1, 7 (1995).
In her response to the motion for summary judgment, Ms. Cooper raised a broad due process challenge to the use of summary judgment for termination of parental rights. In this appeal she also mentions the due process clause as a possible basis for relief. However, she has scaled back her argument, claiming only that termination of parental rights by summary judgment violates due process when the grounds are mental illness and when there are disputed issues of material fact. Of course, as a matter purely of state law, it is improper to grant summary judgment in any context when there are disputed issues of material fact. Telenois, 256 Ill.App.3d at 901, 195 Ill.Dec. 117, 628 N.E.2d at 584. Accordingly, Ms. Cooper's constitutional argument is superfluous. Since the constitutional question is not necessary to the disposition of the case, we will not address it. Aurora East Public School District No. 131 v. Cronin, 92 Ill.App.3d 1010, 1021, 48 Ill.Dec. 88, 415 N.E.2d 1372, 1381 (1981).
We now turn to the pleadings, exhibits and Mr. Cooper's affidavit to determine if there is evidence in Ms. Cooper's favor that could raise a genuine issue of material fact. Dr. Corcoran's report, like Dr. Miller's report, does indicate that Ms. Cooper has mental health issues, although his primary diagnosis was depression rather than schizophrenia. He indicated that she had parenting ability even if it was "only marginal." Most importantly, he wrote that he could not elicit from Ms. Cooper in the interview any tendency to be violent or neglectful toward her children.
The State argues that Mr. Cooper's affidavit should not be considered because it does not consist of expert testimony. According to the State, the Adoption Act requires that the court only consider "competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist." We disagree. The Adoption Act provides that the State must establish by clear and convincing evidence the parent's inability to discharge parental responsibilities due to mental illness, supported by "competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist." 750 ILCS 50/1(D)(p) (West 1998). The Adoption Act does not restrict the type of evidence that can be used to show that the parent does have the mental capacity to discharge parental responsibilities.
Next, the State contends that, apart from the Adoption Act, the affidavit was not proper as a matter of general evidence law. Affidavits submitted on summary judgment motions are substitutes for testimony and are subject to the same requirements as competent testimony at trial. Wiszowaty v. Baumgard, 257 Ill.App.3d 812, 819, 196 Ill.Dec. 79, 629 N.E.2d 624, 630 (1994). The State argues that Mr. Cooper is not qualified to give an opinion as to Ms. Cooper's sanity. Generally lay witnesses may not express opinions with respect to areas of specialized knowledge beyond that possessed by the average person. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 701.1 (6th ed.1994). Despite that general rule, nonexperts "who have had an opportunity to observe a person may give their opinions of mental condition or capacity based on facts observed, including *616 conversations. Such lay opinions may overcome an expert opinion." People v. Bleitner, 189 Ill.App.3d 971, 976, 137 Ill. Dec. 487, 546 N.E.2d 241, 245 (1989). Further, it should be noted that it is probably true that no one has had a better opportunity to observe Ms. Cooper than her husband.
Moreover, the Adoption Act required the State not only to prove that Ms. Cooper was suffering from a mental illness or impairment, but also that this mental condition rendered her unable to discharge her parental responsibilities. "[N]ot every parent with a psychiatric illness or condition is per se unfit to be a parent and to maintain custody of her children. The statutory scheme does not envision that all parents with a designated mental disability will have their parental rights terminated." In re A.J., 269 Ill.App.3d 824, 827-28, 207 Ill.Dec. 152, 646 N.E.2d 1239, 1241 (1994). Accordingly, even if Mr. Cooper's affidavit does not contain competent evidence as to his wife's mental condition as such, it may still contain evidence relevant to the effect of her mental condition, whatever the diagnosis may be, on her ability to parent her children.
The State also argues that Mr. Cooper's affidavit cannot be considered because it consists purely of conclusions, which is contrary to Supreme Court Rule 191(a). 145 Ill.2d R. 191(a). Admittedly, certain portions of the affidavit are conclusory and merely assert what must be proved. For instance, it was proper to disregard the statement that Ms. Cooper was able and competent to parent her children, a bare assertion of the opposite of the finding sought by the State that she was unable to discharge her parental responsibilities. However, only the tainted portion of the affidavit need be disregarded. Wiszowaty, 257 Ill.App.3d at 820, 196 Ill.Dec. 79, 629 N.E.2d at 631. We believe that the affidavit also contained evidence based on personal observation that would serve to shed light on the ultimate issue. Mr. Cooper's statements that he had never known Ms. Cooper to "misinterpret facts, to deny past problems, to deny current problems, to minimize problems, or to externalize blame" and that he had never known her "to fail to recognize or to fail to understand the needs of her children" would be examples.
The trial court discounted Mr. Cooper's affidavit on the grounds that he was biased. However, "[i]n determining the genuineness of a material fact issue, the court should ignore personal conclusions as to motive or credibility and should liberally construe the evidence in favor of the party opposing the motion for summary judgment." In re Estate of Jessman, 197 Ill.App.3d 414, 421, 143 Ill.Dec. 783, 554 N.E.2d 718, 721-22 (1990).
Termination of parental rights is a drastic measure and, accordingly, the facts must be reviewed with close scrutiny. In re S.W., 315 Ill.App.3d 1153, 1157, 249 Ill.Dec. 102, 735 N.E.2d 706, 709 (2000). As difficult as it might be to obtain summary judgment in a civil case with a preponderance of the evidence standard, it is significantly harder here, where at the hearing the State would have to prove its case by clear and convincing evidence. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 215 (1986).
There are extremely few Illinois cases in which a summary determination of parental unfitness has been upheld. The State has not cited a case from any jurisdiction in which a court has upheld a summary *617 determination of unfitness on the basis of mental illness. In almost all of the Illinois cases in which a summary finding of parental unfitness has been upheld, the finding was based on the fact that the parent had committed a crime that served as a per se factor establishing parental unfitness. In re Ray, 88 Ill.App.3d 1010, 44 Ill.Dec. 182, 411 N.E.2d 88 (1980) (criminal conviction resulting from death of a child by physical abuse); In re G.W.S., 196 Ill. App.3d 107, 142 Ill.Dec. 735, 553 N.E.2d 85 (1990) (same); In re J.H., 292 Ill.App.3d 1102, 227 Ill.Dec. 182, 687 N.E.2d 105 (1997) (same); In re A.M.F., 311 Ill.App.3d 1049, 244 Ill.Dec. 686, 726 N.E.2d 661 (2000) (finding of physical abuse under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 1998)) and a conviction for aggravated battery of the child). These cases all turned on construction of the relevant statutory provisions rather than on issues of fact. Here, by contrast, factual issues are at the crux of the case.
In In re S.W., the parent had been convicted of first degree murder. This conviction did not per se require a finding of unfitness under the Adoption Act, but it created a rebuttable presumption of unfitness. In re S.W., 315 Ill.App.3d at 1157, 249 Ill.Dec. 102, 735 N.E.2d at 709. Here, however, the burden to be employed at trial did not shift.
The only other Illinois summary judgment case brought to our attention in which a finding of unfitness was upheld although not required as a matter of law under the Adoption Act because of a per se factor is In re Marriage of T.H., 255 Ill. App.3d 247, 193 Ill.Dec. 370, 626 N.E.2d 403 (1993). In that case, the father had been proven beyond a reasonable doubt to have murdered the mother of the children. The record of the criminal trial indicated that the murder was accompanied by exceptionally brutal and heinous behavior. The appellate court found that this would support a summary finding of unfitness due to depravity. In re Marriage of T.H., 255 Ill.App.3d at 259, 193 Ill.Dec. 370, 626 N.E.2d at 412.
On appeal, the father did not contend that he was innocent of the murder or that his behavior had been other than brutal or heinous. Rather, his challenge was to the constitutionality of using evidence from the trial at his fitness hearing. In re Marriage of T.H., 255 Ill.App.3d at 256-57, 193 Ill.Dec. 370, 626 N.E.2d at 411. Since as a matter of law it was constitutional to use the evidence, the only issue that the summary finding of unfitness precluded inquiry into was an inference: the very short step from the fact that the father murdered the children's mother in a brutal and heinous manner to the conclusion that he was unfit to parent them due to depravity. The case at bar is more complicated.
Summary judgment may be more or less useful depending on the subject matter of the dispute. See In re Estate of Jessman, 197 Ill.App.3d at 419, 143 Ill.Dec. 783, 554 N.E.2d at 720-21 ("summary judgment is particularly inappropriate where the inferences sought to be drawn by the parties deal with questions of motive, intent or subjective feelings and reactions"). We do not wish to suggest that there are no cases in which summary findings of parental unfitness on grounds of mental illness or impairment would be appropriate. However, we believe that the question of whether a parent has a mental illness or impairment that prevents her from discharging her parental duties, unlike the question of whether a parent has a conviction for a particular crime, is a nuanced, fact-intensive question that does not *618 readily lend itself to summary determination.
In this case, there are unresolved factual issues that merit a hearing. For instance, how would Ms. Cooper function as a parent if she resumed medication and therapy, despite her failure to internalize the need for treatment? According to Dr. Corcoran, a psychiatric assessment of Mr. Cooper was necessary to an assessment of the Coopers' overall capacity to raise the children. What does Mr. Cooper add to the equation? We believe that Ms. Cooper should have the opportunity to put such questions to the experts.
Accordingly, having reviewed the pleadings, exhibits and the affidavit de novo, we find that there are genuine issues of material fact and that the court should not have granted summary judgment. The finding of unfitness was a necessary precursor to the order terminating Ms. Cooper's parental rights and appointing a guardian with power to consent to adoption. In re Petition of Doe, 159 Ill.2d 347, 349, 202 Ill.Dec. 535, 638 N.E.2d 181, 182 (1994). We therefore reverse that order and remand for a fitness hearing.
Reversed and remanded.
McNULTY, P.J., and O'MARA FROSSARD, J., concur.