*In re* J.B. *et al.*, Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. W.B., Respondent-Appellant).

First District (2nd Division)   No. 1—99—3075

Opinion filed February 26, 2002.

Rita A. Fry, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer Kisicki, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Deborah Pergament, of counsel), for appellees J.B. and T.B.

PRESIDING JUSTICE BURKE delivered the opinion of the court:

Respondent W.B. appeals from an order of the circuit court granting the State summary judgment on its petition to declare that she is an unfit parent under section 1(D)(q) of the Illinois Adoption Act (Act) as amended in 1998 (750 ILCS 50/1(D)(q) (West 1998)). On appeal, respondent contends that the 1998 amendment of section 1(D)(q) of the Act could not be applied retroactively to her case and the amendment is unconstitutional in violation of the due process and equal protection clauses of the United States and Illinois Constitutions. For the reasons set forth below, we affirm.

In 1992, respondent pled guilty to the aggravated battery of one of her children. The indictment against respondent alleged that she struck her son S.J. with an extension cord. Respondent was sentenced to 70 days' imprisonment, which she had already served while incarcerated, and probation. Respondent's son J.B. was born on March 4, 1993. The Department of Children and Family Services (DCFS) subsequently took custody of him.

On September 4, 1994, an "adjudication hearing" was held with regard to J.B. during which a stipulation was read into the record that respondent had been experiencing psychiatric problems and had failed at times to "follow through" with "any and all" recommendations she received through counseling and DCFS. Ivett Riley, a caseworker at the Bensonville Home Society, also testified at the hearing. She stated that she had been assigned to respondent's case since July 1992 and that respondent had been having supervised visits with J.B., who was currently in a traditional, "nonrelative" foster home. Respondent was participating in the services provided and was starting individual psychotherapy. Riley stated that respondent had also completed a parenting class. According to Riley, respondent did not currently need other services. The trial court informed respondent that she would have one year in which to work for the possible return of J.B. to her custody.

On February 1, 1995, a "disposition hearing" was held on J.B.'s case. Kevin Connolly, a DCFS case manager assigned to J.B.'s case, testified that respondent was having regular visits with J.B. once a week. According to Connolly, respondent had been ordered to take

psychiatric medicine for her mental health problem, but she was not taking the medication. Although he was aware that respondent was currently pregnant, he did not know if the pregnancy was the reason respondent was not taking her medication. He also reported that respondent was attending group therapy and parenting classes. Connolly stated that it was also recently recommended that respondent receive individual therapy.

Following Connolly's testimony, the State recommended that respondent be found unfit due to her mental health concerns and the fact that she had not been taking her medication. The State also offered evidence of respondent's 1992 conviction for aggravated battery of a child. The trial court found that it was in the "best interests" of J.B. that he be made a ward of the court and that respondent was "unable and unfit" based on her criminal conviction, her mental health, and her failure to take her medication for "whatever reason."

Connolly then offered additional testimony that the current goal for J.B. was "return home" and that there was no reason to believe the "minors" would be abused or neglected in the home. Respondent's counsel then asked the trial court to reconsider its finding of unfitness based on Connolly's and DCFS's goal of returning J.B. to his home. The trial court stated that it would reconsider its finding, but again determined that respondent was unfit.

On March 6, 1995, respondent's son T.B. was born, and DCFS took custody of him on March 7. On August 14, 1995, an adjudication hearing was held on T.B.'s case. Kevin Connolly from DCFS again testified, stating that the case was brought with respect to T.B. because of a "risk of harm" to him based on respondent's failure to comply with prior recommended services and her mental health history. He reported that respondent was currently required to participate in counseling and take medication for schizophrenia, but that respondent had told him that she had not been taking her medication between September 1994 and March 1995. Connolly also stated that respondent had a history of abuse against her oldest child, S.J., on whom she had left permanent marks with an electrical cord. She also had prior psychiatric hospitalizations. According to Connolly, despite respondent's guilty plea to aggravated battery in 1992, she continued to insist that she did not abuse her son. He further stated that respondent also told him that she had been taken off of her medication during her pregnancy, but he also was told that she was "weaned" off of the drugs. Connolly did not have medical records to support either of these statements. He further stated that T.B. was healthy and did not have drugs in his system when he was born. He also stated that respondent was in the hospital from May 3, 1994, to May 9, 1994, with

symptoms of suicidal tendencies, and she was diagnosed there with major depression and psychosis.

Based on this testimony and supporting records, the trial court found that there was a "substantial risk" of abuse to T.B.

On February 26, 1996, a dispositional hearing was held on T.B.'s case. Darryl Powell, a caseworker from Reaching the Mark Family Services, testified that respondent had been having supervised visits with T.B. and exhibited appropriate behavior. Jacqueline Chester, a caseworker at Bensonville Home Society, testified that respondent had been given random urine "drops" for the last three months. Respondent's first two drops were negative, and Chester did not have the results from the third drop. According to Chester, on February 16, 1996, respondent received a psychological examination with a subsequent recommendation for her to participate in psychotherapy and receive behavior modification techniques for possible family therapy with her children. Respondent was seeing a psychiatrist and receiving medication for depression. She was cooperating with services, but she did not attend individual psychotherapy. After a recent psychotherapy examination, respondent was diagnosed with an early onset of dysthymic disorder and personality disorder. According to her information, Chester believed that respondent was not taking medication for schizophrenia at that time. Chester stated that respondent's symptoms were being well controlled with the medication. Chester also stated that according to a letter from Dr. Rebecca Lewis Falluf, respondent had been seeing Falluf for more than a year for individual psychotherapy. Falluf recommended in the letter that respondent participate in family therapy, if and when her children returned home. There was no recommendation in the letter for continued individual psychotherapy.

Following the hearing, the trial court found respondent "unable and unwilling" to care for T.B., declared him a ward of the court and appointed a guardian.

On December 21, 1998, the State filed supplemental petitions to terminate respondent's parental rights to both J.B. and T.B. based, in part, on her prior aggravated battery conviction and amended section 1(D)(q) of the Act. On July 15, 1999, the State filed a motion for summary judgment on its supplemental petitions, arguing that section 1(D)(q) of the Act, as amended in 1998, stated as a matter of law that respondent was unfit under the Act because of her 1992 conviction for aggravated battery of her oldest child, S.J. Respondent filed a response to the motion, arguing that the 1998 amendment to the Act could not be applied retroactively to her case because the amendment would affect her "vested right" in raising her children. According to respon-

dent, because a vested right would be affected, the amendment could only be applied prospectively.

On August 8, 1999, a hearing was held on the State's motion for summary judgment. The State based its entire argument on section 1(D)(q), as amended, arguing that as a matter of law the Act deemed respondent unfit because of her 1992 conviction and that, because raising one's own child was not a "vested right," there was no improper application of the amended statute to the case. Respondent argued that her 1992 conviction should not be considered because both J.B. and T.B. were born after the conviction and her vested right in raising them would be affected through application of the amendment. The trial court granted the State's motion, finding that a parent's right or interest in raising a child did not constitute an absolute vested property right and that respondent was unfit as a matter of law. The fathers of both J.B. and T.B. were also found unfit based upon clear and convincing evidence of their abandonment of the children.

The parties then conducted a "best interests" hearing with respect to both J.B. and T.B. Adrea Brown, a case supervisor at Lifelink, testified that she had worked as a supervisor on J.B.'s case for over two years. J.B. had been in a foster home since July 1993. Respondent had not visited J.B. for 1 to 1½ years, and Brown believed that it was in J.B.'s best interests that respondent's parental rights be terminated. Eva Holland-Switchett, a caseworker from Reaching the Mark Family Services, testified that she was working on T.B.'s case. Respondent's last visit with T.B. was on July 6, 1999. She also stated that respondent had shown inconsistencies in her desire to visit T.B. Switchett also believed that based on the length of time that T.B. had been with his foster parents and his need for stability, respondent's parental rights to T.B. should also be terminated.

Respondent, who was 36 years old, testified that she loved her children and still wished to care for them. She bought them Christmas and birthday gifts, but T.B.'s foster parents would reject the gifts. She blamed her inability to visit J.B. on his caseworker who she claimed often cancelled visits. She admitted that she might have cancelled one visit herself. Respondent also stated that she had been participating in services for five or six years with the hope that she would regain custody of her children. The services had helped her to control her anger and frustration. She stated that she would like to continue her visits and that, although she believed that she was currently a fit parent, she would continue to work to become a better parent. She also stated that she had not been convicted of a crime since either J.B. or T.B. had been born.

Following the testimony, the trial court found that it was in the best interests of the children to terminate respondent's parental rights to both children as requested by the State in its supplemental petition. This appeal followed.

## I. RETROACTIVE APPLICATION

Respondent first contends that the trial court erred in applying the 1998 amendment to the Act "retroactively" to terminate her parental rights. She argues that the former version of section 1(D)(q) of the Act should have been applied and that her criminal conviction for aggravated battery of a child should not have been a basis for the court's determination that she was "unfit" because that conviction occurred prior to the births of J.B. and T.B. Respondent claims that the 1998 amendment affected her "fundamental liberty interest" in having and raising her own children, "chang[ing] substantive law," and that the amendment therefore should not have been applied retroactively. She requests that this matter be remanded for a new termination hearing.

The State contends that the trial court's application of the 1998 amendment to the Act was proper because respondent failed to show that she had an "absolute vested property right in beating her children." Because respondent did not have such a vested property right, the State argues that the "subsequent legislative enactment [of amended section 1(D)(q)] is valid within the ambits of the *ex post facto* laws of the United States and Illinois Constitutions." The State also notes that the supplemental petitions for "Appointment of a Guardian with Right to Consent to the Adoption" of J.B. and T.B., thereby terminating respondent's parental rights, were filed after the effective date of the 1998 amendment of the Act. Although the State admits that respondent has a fundamental interest in controlling the upbringing of her children, it claims that the application of the amendment here is not improper because the amendment "in reality" does not "reach back and interfere with respondent's absolute vested rights." The State maintains that respondent's interest in raising her sons is not "absolute."

The public guardian has adopted the State's argument as to this issue. The public guardian also contends, however, that the amendment to section 1(D)(q) was merely "a clarification of existing law." He further argues that applying the "legislative approach" to the issue of whether the section should be applied retroactively, the court must ask whether the amended statute attaches new legal consequences to events completed before its enactment. Under this approach, the public guardian claims that the Act, prior to the amend-

ment, permitted the termination of parental rights for depravity and that aggravated battery was indicative of such depravity. The public guardian maintains, therefore, that the amendment of section 1(D)(q) was merely a clarification of this potential basis for an unfitness finding.

■■ The Illinois Supreme Court has held that a reviewing court should apply the law as it exists at the time of an appeal unless the change in the law would affect a vested right. *First of America Trust Co. v. Armstead*, 171 Ill. 2d 282, 289, 664 N.E.2d 36 (1996). "[V]ested rights are interests that are protected from legislative interference by our due process clause." *Armstead*, 171 Ill. 2d at 289. If an amendment does not "reach back" and interfere with a vested right, there is no true retroactive impact. *Armstead*, 171 Ill. 2d at 289. A statute is not retroactive merely because it relates to antecedent events or because it draws upon antecedent facts for its operation. *Armstead*, 171 Ill. 2d at 289-90. A retroactive change in the law is one that takes away or impairs vested rights under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect of transactions or considerations that have already passed. *Armstead*, 171 Ill. 2d at 290, quoting *United States Steel Credit Union v. Knight*, 32 Ill. 2d 138, 142, 204 N.E.2d 4 (1965). If vested rights are not involved because an amendment is procedural in nature or the rights are not yet perfected, the amendment can be applied without any retroactive impact. *Armstead*, 171 Ill. 2d at 290.

■ The supreme court has also recognized that the question of whether a particular expectation rises to the level of a vested right is not capable of a precise definition. *Armstead*, 171 Ill. 2d at 290. It has therefore defined a vested right as an "expectation that is so far perfected that it cannot be taken away by legislation." *Armstead*, 171 Ill. 2d at 290. Additionally, a vested right is a complete and unconditional demand or exemption that may be equated with a property interest. *Armstead*, 171 Ill. 2d at 291.

■ The due process clause of the fourteenth amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. The due process clause provides heightened protection against government interference with certain fundamental rights and liberty interests. *In re M.H.*, 196 Ill. 2d 356, 362, 751 N.E.2d 1134 (2001), quoting *Washington v. Glucksberg*, 521 U.S. 702, 719-20, 138 L. Ed. 2d 772, 787, 117 S. Ct. 2258, 2267 (1997). The due process clause protects a parent's right to bring up his or her children and control their education (*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35, 69 L. Ed. 1070, 1077-

78, 45 S. Ct. 571, 573 (1925)) and the freedom of personal choice in the matters of family life (*Santosky v. Kramer*, 455 U.S. 745, 753, 71 L. Ed. 2d 599, 606, 102 S. Ct. 1388, 1394 (1982)). Illinois courts have also recognized a parent's liberty interest in raising his or her children. *M.H.*, 196 Ill. 2d at 362. Because of the liberty interest involved, courts will not easily terminate parental rights. *M.H.*, 196 Ill. 2d at 356. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 71 L. Ed. 2d at 610, 102 S. Ct. at 1397. Procedures used in the termination of parental rights must meet the requisites of the due process clause. *M.H.*, 196 Ill. 2d at 363, citing *Santosky*, 455 U.S. at 753, 71 L. Ed. 2d at 606, 102 S. Ct. at 1394.

◼ Section 1 of the Act provides, in relevant part:

"§ 1. Definitions. When used in this Act, unless the context otherwise requires:

A. 'Child' means a person under legal age subject to adoption under this Act.

\* \* \*

D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following:

\* \* \*

(q) The parent has been criminally convicted of aggravated battery, heinous battery, or attempted murder of any child." 750 ILCS 50/1(A), (D)(q) (West 1998).

The State is required to prove by clear and convincing evidence at least one of the statutory grounds of unfitness listed in section 1(D). *In re S.W.*, 315 Ill. App. 3d 1153, 1156, 735 N.E.2d 706 (2000).

◼ The First District Appellate Court has previously held that "a parent's right or interest in his child does not amount to an absolute vested right." *S.W.*, 315 Ill. App. 3d at 1156; *In re Ladewig*, 34 Ill. App. 3d 393, 398, 340 N.E.2d 150 (1975). Section 1(D) is a list of statutory grounds that will support a finding of parental unfitness; it is not a list of parental rights. *S.W.*, 315 Ill. App. 3d at 1157. The legislature has an "ongoing right" to amend statutes to include rebuttable presumptions that may be applied retroactively. *S.W.*, 315 Ill. App. 3d at 1157.

In *S.W.*, this district specifically addressed respondent's argument here that an amendment to section 1(D) of the Act should not be applied retroactively because it affects a parent's vested right in her re-

lationship with her child. S.W. was born in 1992 and taken into custody by DCFS in 1993 due to environmental neglect by his mother, whose rights were not at issue in the case. In 1995, S.W. was adjudicated neglected and made a ward of the court. In 1997, the State filed a petition to terminate the respondent father's parental rights. The respondent had been convicted of first degree murder in 1992 and received a 27-year sentence. Prior to 1998, section 1(D)(i) of the Act provided that when a parent was convicted of the murder of any child or of the murder of a parent of a child to be adopted, that conviction created a presumption that the parent was depraved which could only be overcome by clear and convincing evidence. *S.W.*, 315 Ill. App. 3d at 1154-56. Effective June 20, 1998, the section was amended, creating a rebuttable presumption that a parent is depraved if the parent had been criminally convicted of either first or second degree murder of *any person* within 10 years of the filing date of the petition or motion to terminate parental rights. *S.W.*, 315 Ill. App. 3d at 1156. On October 30, 1998, based on the amended statute, the State filed a motion for leave to amend the petition and terminate the respondent's parental rights. The trial court applied the amendment, found that it was in S.W.'s best interests that the respondent's parental rights be terminated, and granted the State summary judgment. *S.W.*, 315 Ill. App. 3d at 1155-56.

On appeal in *S.W.*, the respondent contested the finding of unfitness, arguing that the statute was amended after the State had filed its petition to terminate parental rights and that the amendment was inapplicable to him and interfered with his vested right to a relationship with his child. *S.W.*, 315 Ill. App. 3d at 1156. The *S.W.* court rejected the respondent's contention that his interest in his child amounted to an absolute vested right. Holding that section 1(D) created a list of statutory grounds supporting a finding of unfitness, as opposed to a list of parental rights, the court found that the amendment applied to the case before it. The *S.W.* court further found that, based on the evidence presented at the hearing on the State's motion for summary judgment, the respondent failed to rebut the presumption of depravity created by his conviction for first degree murder within 10 years of the filing of the State's petition to terminate his parental rights, and the court affirmed the judgment of the trial court. *S.W.*, 315 Ill. App. 3d at 1157.

It is clear from both federal and Illinois cases that the right to have and raise children is one of the most basic fundamental liberty interests protected by the due process clause. The First District Appellate Court, however, in both *S.W.* and *Ladewig*, has held that a parent's right to a relationship with his or her child is not a "vested right." In

*S.W.,* this court also stated that the list of statutory factors in section 1(D) of the Act is not a list of parental rights and, instead, is a list of factors supporting a finding of unfitness. As stated above, and relied on in *S.W.,* a court is required to apply the law as it exists at the time of an appeal unless the law would affect a vested right. *Armstead,* 171 Ill. 2d at 289. Also, a retroactive application of the law is one that affects vested rights. *Armstead,* 171 Ill. 2d at 289. As in *S.W.,* respondent here argues that the application of the 1998 amendment of section 1(D), specifically subsection (q) in this case, affects her interest in raising her children. Because this interest, however, is not a vested right, the application of the 1998 amendment to respondent's pending case was not an improper retroactive application of the statute. Further, in order to reverse the trial court, respondent's liberty interest in raising her children would have to be considered a vested right, but *S.W.* and *Ladewig* clearly hold otherwise. Accordingly, we find that the trial court properly applied amended section 1(D)(q) of the Act.

## II. DUE PROCESS

Respondent next contends that section 1(D)(q) of the Act, as amended, is unconstitutional because it violates the due process clause of both the United States and Illinois Constitutions. Respondent argues that the section is not narrowly drawn to promote a legitimate state interest and, therefore, it cannot withstand strict scrutiny. Specifically, respondent maintains that section 1(D)(q) does not contain a specific time limit within which a prior conviction can be considered with respect to an "unfitness" determination and does not provide a method for the parent to challenge or overcome the "presumption" of unfitness created by the "rule of law" in the section. According to respondent, she was not given the opportunity to present any evidence regarding changes in her circumstances since she pled guilty to the charge of aggravated battery of her oldest child or regarding her efforts to rehabilitate herself. She claims that "procedural safeguards" such as those contained in section 1(D)(i), including the opportunity to rebut a presumption of unfitness and specific time limits with respect to the relevance of a conviction, would add little or no additional cost or effort to the State in such proceedings.

The State contends that its interest in protecting minors is "sufficiently compelling" to satisfy strict scrutiny and uphold section 1(D)(q), as amended. The State specifically argues that where a parent has severely injured one of her children and, therefore, demonstrated an "inability to care for any children without an increased danger to those children," the State has an interest in protecting the remaining children even if they have not yet been abused. The State further

argues that a parent has the opportunity to demonstrate her concern for, love for, and ability to parent her children during the "best interests" portion of the hearing. The State notes that a finding of unfitness is not·a *de facto* termination of respondent's parental rights and application of the amendment did not deprive her of her due process rights.

The public guardian contends that the amendment here does not violate either substantive or procedural due process. With respect to substantive due process, the public guardian argues that the amendment is tailored to express the State's compelling interest in protecting children from abuse even when the parent has shown a propensity to commit such abuse, but has not yet abused the child who is the subject of the termination proceeding. It maintains, therefore, that a parent's actions, both before and after the birth of a child, are relevant to the protection of the child under the Act. With respect to procedural due process, the public guardian argues that the amendment is not unconstitutional merely because it simplifies the proof necessary to find unfitness in certain situations, such as where the parent has a conviction involving battery to a child. The public guardian further claims that the established procedures also protect the parent because a finding of unfitness is not an automatic termination of parental rights, and the parent may contest the termination of rights at the "best interests" hearing.

■ "All statutes are presumed to be constitutional." *In re R.C.*, 195 Ill. 2d 291, 296, 745 N.E.2d 1233 (2001). The burden of rebutting this presumption and clearly establishing a constitutional violation is on the party challenging the constitutionality of the statute. *R.C.*, 195 Ill. 2d at 296. It is the duty of the court to construe acts of the legislature so as to affirm their constitutionality and validity if it can reasonably do so. *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 163, 692 N.E.2d 306 (1998).

■ Proceedings used to terminate parental rights must meet the requisites of the due process clause. *Santosky*, 455 U.S. at 753, 71 L. Ed. 2d at 606, 102 S. Ct. at 1394; *M.H.*, 196 Ill. 2d at 363. The United States Supreme Court has identified three factors to be considered by courts in determining what the due process clause requires: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976); *M.H.*, 196 Ill.

2d at 363. The Supreme Court has applied these factors to cases involving the termination of parental rights. *Lassiter v. Department of Social Services*, 452 U.S. 18, 31, 68 L. Ed. 2d 640, 652, 101 S. Ct. 2153, 2161-62 (1981). The State has two interests in a proceeding to terminate parental rights: (1) a *parens patriae* interest in preserving and promoting a child's welfare, and (2) a fiscal and administrative interest in reducing the cost and burden of such proceedings. *Santosky*, 455 U.S. at 766, 71 L. Ed. 2d at 615, 102 S. Ct. at 1401.

As stated above, a parent's interest in having and raising children is considered a fundamental liberty interest which is protected under "heightened protection" by the due process clause. *M.H.* 196 Ill. 2d at 362-63. Both parties agree that because the issue here involves a fundamental liberty interest, when determining whether section 1(D)(q), as amended, is unconstitutional as violative of the due process clause, the court must apply a strict scrutiny analysis. The statute, therefore, must be narrowly tailored to promote a compelling state interest.

Respondent basically argues that section 1(D)(q) violates the due process clause because it is not sufficiently narrowly tailored. Specifically, respondent's brief directs our attention to the absence from section 1(D)(q) of a specific time limit during which a conviction for aggravated battery of a child may be considered in an unfitness hearing and the absence of an opportunity to rebut the presumption that a parent is unfit based on the existence of such a conviction. In contrast, respondent points out that section 1(D)(i), as recently amended, only allows a conviction for first degree murder to be considered in a fitness hearing within 10 years of that conviction. Additionally, a presumption that a parent is unfit based on such a conviction within 10 years of the State's petition to terminate parental rights may be rebutted by the parent. 750 ILCS 50/1(D)(i) (West 1998).

The First District Appellate Court, however, has recently recognized that in the "extremely few" Illinois cases in which a summary determination of unfitness has been upheld, almost all of those cases involved a judgment of unfitness based on the fact that the parent had committed a crime that serves as a *"per se"* factor establishing parental unfitness. *In re T.J.*, 319 Ill. App. 3d 661, 671, 745 N.E.2d 608 (2001). In *In re Ray*, 88 Ill. App. 3d 1010, 411 N.E.2d 88 (1980), the respondent was convicted of murder and cruelty to children on evidence of common design and participation in her boyfriend's torture and abuse of the respondent's 17-month-old daughter, resulting in her death. Prior to the respondent's conviction, the State had filed a petition seeking termination of the respondent's parental rights to her three other children. At that time, section 1(D)(i) of the Act provided

that a criminal conviction of a parent resulting from the death of any child by physical abuse constituted a ground for finding the parent unfit. Following the respondent's conviction, the State moved for summary judgment, which the trial court granted.

On appeal, the *Ray* respondent argued that the statute violated her equal protection and due process rights. *Ray*, 88 Ill. App. 3d at 1011. The respondent also argued that a parent who abuses and kills one child will not automatically mistreat her other children, the causes of such abuse can be treated and eliminated, and the statute imposed an "impermissible 'irrebuttable' or conclusive presumption." *Ray*, 88 Ill. App. 3d at 1013-14. The *Ray* court rejected this argument, stating that prior Illinois cases had found that abuse of one child was sufficient to support findings of parental unfitness and termination of parental rights as to the parent's other children. *Ray*, 88 Ill. App. 3d at 1013. The *Ray* court further found that the statute promoted an "overriding state interest" that withstood constitutional attack under any level of scrutiny. Lastly, the court agreed with the State that the "irrebuttable presumption" challenged by the respondent "is nothing more than the relation between a fact and its legal result," and stated that it failed to see how the statute constituted a presumption in any sense. *Ray*, 88 Ill. App. 3d at 1013-14.

In *In re J.H.*, 292 Ill. App. 3d 1102 (1997), the respondent, convicted of the first degree murder of an 11-year-old girl to whom she was not related, appealed the trial court's grant of summary judgment to the State on the State's petition to terminate the respondent's parental rights, finding that the respondent was unfit to be a parent under section 1(D)(f) of the Act. On appeal, the respondent argued that the trial court erred in applying the section because the victim of her crime was not her own child. *J.H.*, 292 Ill. App. 3d at 1103. The *J.H.* court affirmed the trial court's finding of unfitness, holding that the term "any child" in section 1(D)(f) was clear and that the statute did not require that the abused child be related to the parent for the parent to be found unfit, *i.e.*, a parent's conviction resulting from the death of any child by physical abuse was a ground for finding the parent unfit. *J.H.*, 292 Ill. App. 3d at 1104.

In *In re A.M.F.*, 311 Ill. App. 3d 1049, 726 N.E.2d 661 (2000), the respondent mother took her daughter to the hospital where it was determined that the child's injuries were the result of abuse. The respondent was indicted for aggravated battery of a child, a Class X felony, but she accepted the State's offer of an open plea to aggravated battery, a Class 3 felony. The State subsequently sought to have the respondent declared unfit pursuant to section 1(D)(q), the same section involved in the present case, prior to the amendment of the sec-

tion. The trial court found the respondent unfit and granted the State's motion for summary judgment based on the respondent's conviction for aggravated battery. The respondent had objected, arguing that section 1(D)(q) required a conviction for the specific crime of "Aggravated Battery of *a* Child" as that offense is defined in the Criminal Code of 1961 (720 ILCS 5/12—4.3 (West 1996)), as opposed to a conviction for "aggravated battery of *the* child" who is the subject matter of the termination proceeding. (Emphasis in original.) *A.M.F.*, 311 Ill. App. 3d at 1051-52.

On appeal, the *A.M.F.* respondent further argued that the phrase, "aggravated battery of the child," as used in section 1(D)(q) was ambiguous. The *A.M.F.* court rejected this argument, finding that section 1(D)(q) made no reference to the offense of "Aggravated Battery of a Child" or to the Criminal Code, and that the legislature intended to find a person unfit when that person is convicted of the "aggravated battery of *the* child that is the subject matter of the proceedings." (Emphasis in original.) *A.M.F.*, 311 Ill. App. 3d at 1051-52. The court did not consider the State's alternative argument pursuant to the amendment of section 1(D)(q) at issue in this case, *i.e.*, that the respondent was unfit to be a parent *per se* based on the prior conviction, finding the issue waived because the application of amended section 1(D)(q) had not been raised in the trial court even though the finding of unfitness occurred after the effective date of the amendment. *A.M.F.*, 311 Ill. App. 3d at 1053.

In the present case, with respect to substantive due process, it is clear from Illinois cases cited by the parties and described above that "*per se*" factors for finding unfitness as a matter of law under the Act, such as a conviction for the aggravated battery of a child, have been applied in termination of parental rights proceedings and served as grounds for granting summary judgment to the State. In none of the cases has a court declared such a *per se* factor unconstitutional merely because it required a finding of unfitness as a matter of law. Accordingly, we find no basis supporting an argument that a statute, such as section 1(D)(q), violates a party's due process rights merely because the statute requires a finding of unfitness as a matter of law based on a prior conviction involving abuse of a child.

The more difficult issue, and the one primarily argued by respondent, is whether amended section 1(D)(q) is sufficiently narrowly tailored to express the State's interest in protecting children from abuse. For example, section 1(D)(i), which we quote below in this opinion, creates a rebuttable presumption of unfitness even where the parent has a conviction for murder or multiple felony convictions. Section 1(D)(q) does not permit rebuttal evidence from the parent prior

to an unfitness finding. Further, certain convictions for murder, as referenced here in section 1(D)(i), can only be considered if they are entered within 10 years of the State's petition seeking termination of parental rights. Again section 1(D)(q) contains no similar time limit.

In the present case, as argued by the State and public guardian, the State does have a compelling interest in protecting children from abuse, both after and before the abuse occurs. The amendment to section 1(D)(q) promotes that interest by allowing courts to consider a parent's abuse of one child when determining whether the parent is also fit to parent his or her other current or future children. The State does not have to wait for the abuse to occur. Additionally, despite a finding of unfitness under section 1(D)(q) of the Act, a court cannot automatically terminate a parent's parental rights. A trial court, as here, must also conduct a "best interests" hearing to determine whether it is in the best interests of the child to have a parent's rights permanently terminated. The procedures established by the Act, therefore, do not automatically result in the termination of parental rights following a conviction for one of the offenses listed in section 1(D)(q). Following a finding of unfitness, a parent still possesses the right and opportunity at the "best interests" hearing to present evidence of her rehabilitation and desire and ability to be a parent to her children. Accordingly, we find that such procedures do not violate a party's due process rights, and respondent failed to meet her burden of establishing that section 1(D)(q) is unconstitutional.

## III. EQUAL PROTECTION

Lastly, respondent contends that section 1(D)(q) also violates the equal protection clause of the United States and Illinois Constitutions because it denies a parent who has been convicted of aggravated battery of any child the opportunity to rebut a presumption of unfitness, while section 1(D)(i) of the Act permits parents who have been convicted of offenses such as first degree murder, aggravated criminal sexual assault, and multiple felonies the opportunity to rebut a presumption of unfitness. Respondent argues that a distinction in the punishment given to similarly situated offenders of different, but comparable, crimes has been found to violate equal protection rights in *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942). She claims that she should have been allowed to present "exonerating circumstances" with respect to her conviction and evidence of her "rehabilitation" before being found to have been unfit.

The State contends that section 1(D)(q) and section 1(D)(i) properly make distinctions based on inherent differences in the crimi-

nal behavior of individual parents and in the crimes committed by them in order to promote a compelling government interest in protecting children from child abusers. The State argues that the offenses listed in section 1(D)(q), in which there is no provision allowing the parent the opportunity to rebut a presumption of unfitness, *i.e.*, aggravated battery of a child, heinous battery of a child, or attempted murder of a child, all inherently focus on the parent's intentional and knowing abuse of a child. The State contrasts this with the offenses listed in section 1(D)(i), where rebuttal evidence is allowed, which do not necessarily focus on a parent's intention to hurt a child. For example, the State notes that a conviction may be based on "felony murder" or a "transferred intent scenario" where the conviction did not have an actual relationship to the abuse of a child. The State claims that such a distinction is consistent with the purpose of the Act in protecting children from abusers, as opposed to creating punitive measures for criminals. The State concludes, therefore, that respondent is not similarly situated to persons whose felony convictions did not involve the actual abuse of children.

The public guardian adopts the State's argument on this issue. Additionally, the State argues that even if respondent had been allowed to rebut the presumption of unfitness, the evidence would still have demonstrated that she was unfit, *i.e.*, based upon her aggravated battery conviction, her refusal to participate in psychotherapy, and her failure to visit J.B. for more than one year. The public guardian maintains that this evidence shows that respondent failed to rehabilitate herself, as well as her unfitness to be a parent.

The protection provided by the equal protection clauses of the United States and the Illinois Constitutions is identical. *R.C.*, 195 Ill. 2d at 309; *In re A.A.*, 181 Ill. 2d 32, 36-37, 690 N.E.2d 980 (1998). The government is required to treat similarly situated individuals in a similar manner. *R.C.*, 195 Ill. 2d at 309. The government, therefore, may not treat differently persons who have been placed by statute into different classes on the basis of criteria wholly unrelated to the purpose of legislation. *R.C.*, 195 Ill. 2d at 309. "However, the equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people." *R.C.*, 195 Ill. 2d at 309. Courts apply strict scrutiny to classifications affecting fundamental rights. *A.A.*, 181 Ill. 2d at 37. "To survive strict scrutiny in the equal protection context, as in due process analysis, the means employed by the legislature must be necessary to advance a compelling state interest, and the statute must be narrowly tailored to the attainment of the legislative goal." *R.C.*, 195 Ill. 2d at 309. To have standing to raise an equal protection claim, the party raising the claim

must be a member of the class against whom the statute allegedly discriminates. *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 460, 687 N.E.2d 1014 (1997).

Section 1(D)(i) of the Act, as amended, states:

"(i) Depravity. Conviction of any one of the following crimes shall create a presumption that a parent is depraved which can be overcome only by clear and convincing evidence: (1) first degree murder in violation of paragraph 1 or 2 of subsection (a) of Section 9—1 of the Criminal Code of 1961 or conviction of second degree murder in violation of subsection (a) of Section 9—2 of the Criminal Code of 1961 of a parent of the child to be adopted; (2) first degree murder or second degree murder of any child in violation of the Criminal Code of 1961; (3) attempt or conspiracy to commit first degree murder or second degree murder of any child in violation of the Criminal Code of 1961; (4) solicitation to commit murder of any child, solicitation to commit murder of any child for hire, or solicitation to commit second degree murder of any child in violation of the Criminal Code of 1961; or (5) aggravated criminal sexual assault in violation of Section 12—14(b)(1) of the Criminal Code of 1961.

There is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state, or under federal law, or the criminal laws of any United States territory; and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights.

There is a rebuttable presumption that a parent is depraved if that parent has been criminally convicted of either first or second degree murder of any person as defined in the Criminal Code of 1961 within 10 years of the filing date of the petition or motion to terminate parental rights." 750 ILCS 50/1(D)(i) (West 1998).

Respondent relies primarily on *Skinner* in support of her equal protection argument. In *Skinner*, the Supreme Court reviewed the constitutionality of Oklahoma's Habitual Criminal Sterilization Act (Oklahoma Act) (Okla. Stat. Ann. tit. 57, § 171 *et seq.* (West 1935)), which provided for the sterilization of "habitual criminals." Those eligible for the punishment pursuant to the Oklahoma Act were criminals who were convicted of at least three felonies amounting to crimes of "moral turpitude." The statute, however, specifically excluded offenses arising out of the violation of prohibitory laws, revenue acts, embezzlement, or political offenses. *Skinner*, 316 U.S. at 536-37, 86 L. Ed. at 1657-58, 62 S. Ct. at 1111. The petitioner had been convicted of stealing chickens and two subsequent robberies using firearms. The trial and reviewing courts of Oklahoma found that the

petitioner should be sterilized pursuant to the Act. The majority of the *Skinner* Court reversed the lower courts' judgments, finding that the statute failed to meet the requirements of the equal protection clause. Upon comparing convictions for grand larceny, punishable under the statute, and embezzlement, which was not punishable, the *Skinner* Court found that the nature of the two crimes was "intrinsically the same" and punishable criminally in the same manner. The *Skinner* Court then concluded:

> "When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment. [Citations.] Sterilization of those who have thrice committed grand larceny with immunity for those who are embezzlers is a clear, pointed, unmistakable discrimination." *Skinner*, 316 U.S. at 541, 86 L. Ed. at 1660, 62 S. Ct. at 1113.

■■■ Respondent's reliance on *Skinner* is misplaced. *Skinner* involved a statute in which direct criminal punishments were vastly different for similar crimes. Repeat larcenists might be sterilized while repeat embezzlers were completely exempted from the statute. *Skinner*, 316 U.S. at 541, 86 L. Ed. at 1660, 62 S. Ct. at 1113. The allegedly differential treatment in the present case is not of the same nature and extent as it was in *Skinner*. Here, the Act did not create extremely different punishments for different classes of people committing similar offenses. The Act created a method for the State to have a parent declared unfit for the protection of children because of a prior conviction. The Act did not create classifications for administering direct punishment for convictions. Section 1(D)(q) created a *per se* finding of unfitness, while section 1(D)(i) created a presumption of unfitness that may be rebutted. The risk in being convicted of the crimes listed under either of the sections is the same, *i.e.*, the person may ultimately have his or her parental rights terminated by the court because he or she is unfit. Although, from respondent's viewpoint, section 1(D)(q) of the Act is stricter because it requires a finding of unfitness without the opportunity to rebut that finding, the potential consequences are the same under either section 1(D)(i) or section 1(D)(q) for a conviction of one of the listed offenses. Additionally, as stated above, respondent and other similarly situated parents still possess the opportunity to present evidence of their rehabilitation and ability to be a parent at the required "best interests" hearing.

In summary, we find no authority to support respondent's argument that because section 1(D)(i) creates a rebuttable presumption of unfitness, while section 1(D)(q) does not, that there is an equal protec-

tion violation. Accordingly, respondent has failed to meet her burden of establishing that section 1(D)(q) of the Act is unconstitutional.

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

GORDON and CAHILL, JJ., concur.